_____

NORBERTO LOPEZ and EILEEN LOPEZ, Individu-
ally, and as Parents and Natural Guardians of
NICHOLAS LOPEZ, an Infant over the age of 14,
and NICHOLAS LOPEZ,

                                        Plaintiffs,

                          -vs-                                    DECISION and ORDER
                                                                  05-CV-6473-CJS
WEBSTER CENTRAL SCHOOL DISTRICT, WEB-
STER BOARD OF EDUCATION, JOHN WALKER,
Individually and in his capacity as Principal of Web-
ster-Thomas High School and MARY KIDD, Individu-
ally and in her capacity as Assistant Principal of
Webster-Thomas High School,

                                        Defendants.

_____

## APPEARANCES

For Plaintiffs:                     Nira T. Kermisch, Esq.
                                    32 Old Framingham Road, Unit 20
                                    Sudbury, MA 01776
                                    (585) 232-7280

For Defendants:                     Jeremy Colby, Esq.
                                    Michael P. McClaren, Esq.
                                    Webster Szanyi, LLP
                                    1400 Liberty Bldg.
                                    Buffalo, NY 14202
                                    (716) 842-2800

## INTRODUCTION

**Siragusa, J.** Plaintiffs assert civil rights claims against the Webster Central School

District ("the District") and the Webster Board of Education ("the Board"), and a negligence

claim against the District, the Board, Principal John Walker (in his individual and official

capacities), and Vice-Principal Mary Kidd (in her individual and official capacities).

Defendants have moved for summary judgment (Docket No. 62), and Plaintiffs have filed a cross-motion for summary judgment (Docket No. 66). For the reasons stated below, Defendants' motion for summary judgment is granted on the civil rights claims, Plaintiffs' cross-motion is denied, and the Court declines to exercise jurisdiction over the remaining negligence claim.

## FACTUAL BACKGROUND

Plaintiffs claim that their son, Nicholas Lopez ("Nicholas"), was racially harassed by neighbor and fellow student RM, and by his sister, AM, both in school and in the neighborhood.[1] In summary, Plaintiffs are suing Defendants alleging that they took either no action, or insufficient action, in the face of discrimination complaints concerning Nicholas, then a student at Webster-Thomas High School ("Webster-Thomas"). Plaintiffs contend that based upon the notice Defendants received from Nicholas' parents, and from Nicholas and a classmate, Alyssa Litto ("Alyssa"),[2] they should have known that Nicholas was being harassed. Defendants counter that they had no notice of any harassment prior to October 6, 2004, the date on which Nicholas punched RM three times while in school. Although both were suspended, Nicholas alleges that his suspension was longer and that he did not receive the same tutoring and homework services while he was out of school that AM, who

---

[1] Since Nicholas was over 14 in 2005 when this lawsuit was commenced (Compl. ¶ 2), the Court presumes that he is now over eighteen years of age and it will use his full name in this Decision and Order. RM, a sophomore in high school in 2004, is likewise presumably over eighteen. However, RM's sister's age is not stated and, in order to protect her identity, the Court will use initials for both siblings.

[2] In her affidavit, Alyssa indicated that she was a senior in high school in 2004. (Litto Aff. ¶ 6.)

is Caucasian, received while she was out of school. Nicholas claims that the disparate treatment was due to his Hispanic ethnicity.[3]

Plaintiffs list three[4] causes of action in their amended complaint (Docket No. 15): (1) a claim of intentional discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (2) a claim pursuant to 42 U.S.C. § 1983 that Nicholas suffered a "hostile discriminatory environment" in violation of his rights under the Fourteenth Amendment; and (3) a claim that Defendants negligently failed to stop the harassment Nicholas experienced. The case was originally brought in New York State Supreme Court, Monroe County, Index No. I-2005-8843, and Defendants then removed the action to this Court.

## STANDARDS OF LAW

### Summary Judgment

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). Where the non-moving party will

---

[3]The Court previously dismissed the Second cause of action, an Equal Protection claim plead under 42 U.S.C. § 1983, relying on *Bayon v. State Univ. of N.Y. at Buffalo*, No. 98-CV-0578E(Sr), 2001 U.S. Dist. LEXIS 1511, 8-9 (W.D.N.Y. Feb. 15, 2001). (See Decision and Order, *Lopez v. Webster Central Schl. Dist.*, No. 05-CV-6473 (W.D.N.Y. Mar. 22, 2006) (Docket No. 27).)

[4] The amended complaint lists the third cause of action as a "FOURTH CAUSE OF ACTION." (Am. Compl. at 8.) However, the amended complaint contains only these three causes of action.

bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), rev'd on other grounds *Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's

previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

**Title VI**

Section 601 of Title VI of the Civil Rights Act of 1964 provides in pertinent part as follows:

> No person in the United States shall, on the ground of race, color, or nation origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (1964). The statute prohibits intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) ("it is similarly beyond dispute … that § 601 prohibits only intentional discrimination.") As noted by the second Circuit Court of Appeals, "[b]ecause the statutes share the same goals and because Title IX mirrors the substantial provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." *Curto v. Edmondson*, 392 F.3d 502, 504 n. 3 (2d Cir. 2004) (citation and internal quotations omitted). As the Second Circuit observed in *Tolbert v. Queens College*, 242 F.3d 58 (2d Cir. 2001):

> In order to establish a claim based on either statute, the plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race, ...that that discrimination was intentional...and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions....

*Tolbert*, 242 F.3d at 69 (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 868 (2d Cir. 1998)) (quoting *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977)) (citations omitted).

***Ethnic Identity***

Plaintiff Nicholas Lopez states that he is of "Hispanic origin, namely Puerto Rican." (Nicholas Lopez Aff. ¶ 2.) As the Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation on the Eleventh Circuit Court of Appeals, observed in *U.S. v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005):

> I have used "ethnicity" or "ethnic identity" to describe a juror's Hispanic origin wherever possible, but in some instances the case law refers to a juror's Hispanic "race." However, the Supreme Court appears to use "race" and "ethnicity" interchangeably in the *Batson* context, at least when discrimination against jurors of Hispanic or Latino origin is at issue. *See United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000) ("Under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race."). *Compare Hernandez v. New York*, 500 U.S. 352, 355 (1991) (plurality opinion) (stating that a *Batson* violation would occur if "the prosecutor in [the petitioner's] criminal trial exercised peremptory challenges to exclude Latinos from the jury by reason of their ethnicity"), with *id.* at 372, (O'Connor, J., concurring in the judgment) ("In order to demonstrate [a *Batson*] violation, Hernandez must prove that the prosecutor intentionally discriminated against Hispanic jurors on the basis of their race.")

*U.S. v. Ochoa-Vasquez*, 428 F.3d at 1052. Hispanic is also defined as, "1: of or relating to the people, speech, or culture of Spain or of Spain and Portugal; 2: of, relating to, or being a person of Latin American descent living in the United States; especially: one of Cuban, Mexican, or Puerto Rican origin."[5]

***Private Right of Action Under Title IX of Education Amendments of 1972***

Plaintiffs argue that their claim to a private right of action against Defendants for being deliberately indifferent to Nicholas' harassment by fellow students is supported by the Supreme Court's holding in *Davis Next Friend Lashonda D. v. Monroe County Bd. of*

---

[5] Merriam-Webster Online. Available at http://www.merriam-webster.com/disctionary/Hispanic. Last accessed June 4, 2008.

*Educ.*, 526 U.S. 629 (1999). There, Justice Sandra Day O'Connor wrote about the claims

that the plaintiff made under Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681. She wrote for the Court:

> We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages. *See Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 283 (1998) ("In this case…petitioners seek not just to establish a Title IX violation but to recover damages…"). This Court has indeed recognized an implied private right of action under Title IX, *see Cannon v. University of Chicago, supra,* and we have held that money damages are available in such suits, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992). Because we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause, however, *see e.g. Gebser v. Lago Vista Independent Schools, supra.* at 287 (Title IX); *Franklin v. Gwinnett County Public Schools, supra,* at 74-75, and n. 8 (Title IX); *see also Guardians Ass'n v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 598-599 (1983) (opinion of White, J.) (Title VI), private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue. When Congress acts pursuant to its spending power, it generates legislation "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In interpreting language in spending legislation, we thus "insis[t] that Congress speak with a clear voice," recognizing that "[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it." *Ibid*.; *see also id.*, at 24-25.

*Davis*, 526 U.S. at 639-40. In one of the cases cited from the quotation above, *Guardians*

*Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582 (1983), Justice White, writing

for a plurality, concluded that a private right of action for disparate impact discrimination

is available under Title VI, but the remedy is limited:

> In the typical case where deliberate discrimination on racial grounds is not shown, the recipient will have at least colorable defenses to charges of illegal disparate-impact discrimination, and it often will be the case that, prior to judgment, the grantee will not have known or have had compelling reason to know that it had been violating the federal standards. Hence, absent clear congressional intent or guidance to the contrary, the relief in private actions

should be limited to declaratory and injunctive relief ordering future compliance with the declared statutory and regulatory obligations. Additional relief in the form of money or otherwise based on past unintentional violations should be withheld.

*Guardians Ass'n*, 463 U.S. at 598.

### Hostile Educational Environment

With regard to Plaintiffs' allegations of Defendants' deliberate indifference to a hostile educational environment, in order to prevail on that claim, Plaintiffs must show the following:

> (1) that the child was subjected to a racially hostile educational environment, *see Davis v. Monroe Co. Bd. of Educ.* 526 U.S. 629, 650 (1999) (gender based hostile educational environment); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744-45 (2d Cir. 2003); and (2) that the School District was deliberately indifferent to it. *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999) ("[I]n cases of alleged student-on-student harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves."); *see Bryant v. Independent School Dist.No. I-38 of Garvin County, OK*, 334 F.3d 928, 932-43 (10th Cir. 2003).

*Barnett ex rel. M.B. v. Johnson City School Dist.*, No. 3:04-CV-0763, 2006 WL 3423872, *4 (N.D.N.Y. Nov. 28, 2006). As to the meaning of deliberate indifference, the Second Circuit wrote in the context of explaining that phrase with regard to a Title IX claim that, "a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur." *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 141 (2d Cir. 1999).

### Burden-Shifting Analysis

Courts have applied the familiar *McDonnell Douglas*[6] burden-shifting analysis to cases arising under Title VI. *Fuller v. Rayburn*, 161 F.3d 516 (8th Cir. 1998); *Jackson v.*

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*University of New Haven*, 228 F. Supp. 2d 156, 159-60 (D. Conn. 2002); *McKie v. New York University*, No. 94 Civ. 8610 (LMM), 2000 WL 1521200 (S.D.N.Y. Oct. 13, 2000); *Bettis v. Safir*, No. 97 Civ. 1908, 2000 WL 1336055, at *1 (S.D.N.Y. Sept. 15, 2000).

> Under this analytical framework, the Court will examine three different requirements. First, the plaintiff has the burden of establishing a *prima facie* case of racial discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Second, if the plaintiff establishes a *prima facie* case of racial discrimination, the Court presumes discrimination is present, and the defendant has the burden of rebutting this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802-03; *Russell*, 235 F.3d at 222; *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 n. 19 (5th Cir. 1992). Third, the burden shifts back to the plaintiff to produce evidence that the defendant's proffered explanation is "mere pretext for unlawful discrimination." *Williams* [*v. Galveston Indep. School Dist.*], 256 F. Supp. 2d [668] at 672 [(S.D. Tex 2003); *see also McDonnell Douglas Corp.*, 411 U.S. at 804-05.

*Gant v. Southern Methodist University School of Law*, No. CIVA305CV1455K, 2006 WL 2691301, 2 (N.D.Tex. Sept. 19, 2006).

## DISCUSSION

In their motion for summary judgment, Defendants raise five separate points to support their argument that Plaintiffs' entire complaint against them should be dismissed. The Court will address Defendants' points in order below.

### *Plaintiffs' Title VI Claims*

Defendants' first point is that Plaintiffs' Title VI claims must be dismissed because: (a) the complaint does not allege that the school board received federal financial assistance as required by the statute; (b) Plaintiffs have presented no evidence that the Board of Education received federal funds; and (c) there are no allegations in the amended

complaint, or evidence before the Court on this motion, that the Board of Education intentionally discriminated against Plaintiffs.

With regard to the first two points, the failure to allege or prove that the Board of Education receives federal funds, the amended complaint does allege that the Webster Central School District did receive and continues to receive federal funds. (Am. Compl. ¶ 6.) Defendants do not dispute that the Board of Education is part of the District and the Civil Rights Restoration Act of 1987 overturned the program-specific interpretation of *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 634-36 (1984). As the district court in *Grimes v. Superior Home Health Care of Middle Tennessee, Inc.*, 929 F. Supp. 1088 (M.D. Tenn. 1996) observed:

> "The new definition specifies that entire entities receiving federal funds—whether governmental entities, school systems, or universities—must comply with Title VI, rather than just the particular program or activity that actually receives the funds." *Id.*; *see also* 42 U.S.C. §2000d-4a (Supp. 1996).

*Grimes*, 929 F. Supp. at 1091 (quoting *Stanley v. Darlington County School Dist.*, 879 F. Supp. 1341, 1365 (D.S.C. 1995), *rev'd in part on other grounds*, 84 F.3d 707 (4th Cir. 1996)). The omission of an allegation directed against the Board of Education is inconsequential. 42 U.S.C. §2000d(4)(a) (2002); 20 U.S.C. §7801(26)(A) (2002). Plaintiffs have included an excerpt from the deposition of John D. Carlevatti who testified that the Webster School District received federal funds, including in 2004. (Carlevatti Dep. at 45-46.) Thus, the Court is not persuaded by Defendants' first two arguments against Plaintiffs' Title VI claim.

With regard to Defendants' third argument against Plaintiffs' Title VI claim, as discussed more thoroughly below (in connection with Plaintiffs' Title IX claim), the Court

determines that Plaintiffs have failed to produce evidentiary proof of intentional discrimination, deliberate indifference to a racially hostile educational environment, or disparate treatment.

### *Race-Based Hostile Educational Environment Claim under Title IX*

Plaintiffs argue that Nicholas was subject to intentional discrimination in his school setting based on his Hispanic background and Puerto Rican national origin and that Defendants were deliberately indifferent to the discrimination. Plaintiffs rely on their contention that Nicholas was denied educational services as support for their argument he suffered intentional discrimination. Plaintiffs also contend that the Webster-Thomas administration was deliberately indifferent to the discrimination against Nicholas as evidenced by their unsatisfactory response to Nicholas' harassment.

### *Intentional Discrimination*

Defendants contend that Nicholas was not denied homework or educational services, as Plaintiffs allege, or if he was, the denial was not based on intentional racial discrimination by the District. (Colby Decl. ¶ 79.) In support of their position, Defendants rely on several pieces of evidence submitted with their moving papers. First, they cite to the deposition testimony of Mary Elizabeth Kidd ("Kidd"), the assistant principal at Webster-Thomas. In her deposition testimony, Kidd stated, "well, when a students [sic] is withdrawn from school we provide them [sic] home instruction. So that would have been, I'm looking here actually at a note from, on the prescription pad, saying 'due to health reasons home tutoring until further notice.' And it's dated 10/19."[7] (Kidd Dep. at 95.) Kidd also testified that

---

[7]The note is included among Defendants' exhibits as Ex. Z, and is dated October 19, 2004.

the school district does not send tutors into a student's home when there is no adult present and that in those cases, the tutoring would have been scheduled at a mutually agreed-upon location. (*Id.*) Later in her deposition, she testified that if a parent requests that the school provide homework to the student, "and if there is enough time," the school provides homework to the student. (Kidd Dep. at 112.) In addition, Kidd testified that she believed Nicholas was provided with homework while he was out, saying, "[t]hat's standard practice." (*Id.*)

Defendants also rely on the deposition testimony of Alyssa, a fellow student at Webster-Thomas. She testified that while Nicholas was out of school for medical reasons at the request of his physician, she tutored him in math. (Litto Dep. 29.) Defendants cite to the deposition of Eileen M. Lopez, Nicholas' mother, who testified that once or twice while Nicholas was out of school after the fight and before tutoring was started, his teachers arranged for homework for him. (Eileen Lopez Dep. 32, 39–40.) She also testified that Nicholas received tutoring at Webster-Schroeder High School ("Schroeder") during his absence from school.

In their supporting papers, Defendants also include a number of copies of electronic mail messages.[8] The first is from Shari Stone-Fredericks ("Stone-Fredericks"), R.L. Thomas A-G Counselor, Webster Central School District, is dated November 29, 2004, and is addressed to Charles Heberling, Kevin Henchen, Erin, and Matta, with copies to John

---

[8] Defendants have asserted that the email messages are not provided for the truth of their contents, but merely to show a lack of discriminatory intent. (Def.s' Statement of Undisputed Facts ¶ 83 n.2.)

C. Walker and Mary Kidd, notifying them that Nicholas had incomplete for all his grades. (Def.s' Ex. X 000113.)

Another is from Kidd, dated January 3, 2005, and addressed to Christine Matta, Steve Huge, Erin Meyers and Michael Mitchell.[9] In the message, Kidd asked the addressees to work with Nicholas' mother to get Nicholas caught up and said that any make-up work should be sent to Joan Mills by the end of the day on Tuesday, January 4, 2005. (Def.s' Ex. X 000126.)

Another, from Shelly Cahoon ("Cahoon"), Director of Pupil Services, is dated January 6, 2005. (Def.s' Ex. X 000131.) In the message, addressed to Kidd, she wrote about a meeting that Kidd proposed to have with Nicholas' mother, stating that, "I feel it is very important for Nick, as well as his parents, be [sic] part of this meeting. This will allow all parties to hear the same information and discuss supports in place for Nick. As well as discussing possible additional supports." (*Id*.) Attached to Cahoon's email is an incoming one from Kidd, dated January 5, 2005, indicating that Mr. Lopez had arrived to pick up work for Nicholas. (*Id*.)

In a message addressed to Kidd, dated January 7, 2005, Leann S. Macomber ("Macomber"), School Psychologist at Webster Thomas High School, wrote suggesting a meeting with "Nick, his parent(s) and some of his teachers (he is concerned about social studies and math) so we are all hearing the same thing." (Def.s' Ex. X 000135.)

---

[9]The message does not contain any information further identifying the addressees.

A message dated January 20, 2005, from Stone-Fredericks to Kidd, Cahoon, Walker and Leann,[10] indicates concern by Jill Bryson ("Bryson"), Nicholas' Spanish tutor, that she was trying to see Nicholas, but he missed an appointment and no one called to tell her why, or to reschedule, but that Bryson was trying to contact the parents to set up another session. In a message attached to that one, and dated January 14, 2005, Stone-Fredericks related the several unsuccessful attempts she had made to contact Mrs. Lopez.

A message dated January 20, 2005, written by Bryson, the Spanish tutor, is addressed to Kevin Henchen, Kidd, Stone-Fredericks and Macomber. In it, Bryson relates the contents of a conversation she had with Mrs. Lopez at about 9:45 A.M. that day, in which Mrs. Lopez expressed frustration with her son's failure to attend both Spanish and social studies tutoring sessions. (Def.s' Ex. X 000147.)

In a message dated March 29, 2005, written by Stone-Fredericks and addressed to Vivian Infantino ("Infantino"), Webster Home Instruction Coordinator, with copies to Kidd and Bryson, Stone-Fredericks agreed with Infantino's comment, "I feel that we have made a big effort for Nick to receive home instruction, he is not utilizing it. I would also hate to assign him another tutor and have them [sic] waste their [sic] time." (Def.s' Ex. X 000158.)

The email messages belie Plaintiffs' contention that Defendants intentionally discriminated against him by failing to provide him with tutors or homework. Although not admitted for the truth of the statements therein, the messages refute any intent to discriminate and show, instead, the opposite. All the evidence on which Defendants rely for this motion show that Nicholas was provided with homework and tutoring during the

---

[10]The address line contains only this first name. Presumably, this is a shortcut to Macomber's address in the school's email system.

time he was absent from school at the request of his physician. Moreover, while Nicholas states in his affidavit, "it is not true that the District provided me with homework when I was out of school on suspension. I was out of school on suspension from October 7, 2004 to October 13, 2004, and no homework was provided to me," (Nicholas Lopez Aff. ¶ 84), his mother testified that he was provided with homework once or twice and thereafter, tutoring was provided. Thus, the evidence before the Court on this motion refutes Plaintiffs' contentions that Defendants intentionally discriminated against Nicholas.

Turning specifically to Plaintiffs' allegation that Nicholas was not provided with home tutoring, whereas another similarly-situated Caucasian student, AM, was, Eileen Lopez states in her affidavit,

> When [AM], a Caucasian needed tutoring, she received tutoring at home, but such tutoring was refused for my son even though Mr. Walker knew that my son was pulled out of school because of depression and anxiety related to events in school, but my son did not want to go to school, and that my son suffers from ADD and that it would be difficult for him to work in the environment of the tutoring center.

(Eileen Lopez Aff. ¶ 50.) Defendants' Exhibit P indicates that per John Walker, and beginning on October 20, 2004, with an indefinite end date, Nicholas was to receive tutoring at an alternate site, Schroeder, as a result of Nicholas' doctor's note stating that, "due to health reasons, I recommend home tutoring until further notice." (Defendants' Ex. P.)

Plaintiffs have not provided the basis for Ms. Lopez's statement concerning AM. Plaintiffs have not offered admissible evidence that a non-Hispanic student was provided any services that Nicholas was allegedly denied. With regard to the tutoring, although the Court is unaware of the basis of Mrs. Lopez's knowledge of tutoring arrangements for AM,

assuming *arguendo* that the statement is true, it raises an inference of disparate treatment based on Nicholas' Hispanic heritage. Defendants, however, have come forth with a race-neutral explanation: tutors were not sent to a student's home if no adult was present in the home. (Kidd Dep. at 95.) The Court determines that Plaintiffs have not shown that the decision to tutor Nicholas at Schroeder, instead of at home, was based on racial discrimination.

Furthermore, there is evidence that Nicholas had missed or cancelled several appointments with his tutors and that the tutors were having a difficult time scheduling appointments with Nicholas and his family. (Kidd Dep. at 114.) Plaintiffs contend that Nicholas "missed some tutoring sessions because they were scheduled in the school, after school ended, and Nicholas was unable to tolerate being in school after the other students left, as a result of the racial harassment, the inaction by the school, and being accused by Defendant Walker of being the cause of the racial harassment." (Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 83.) However, the deposition of Mary Kidd reveals that Nicholas' tutors suggested the public library as a possible location for tutoring. (Kidd Dep. at 116-17.) While Plaintiffs contend that the tutoring services were ineffective, Defendants hold that the District provided academic supports to Nicholas, but he failed to make use of such supports. (Def.'s Statement of Undisputed Facts, ¶ 90.)

Additionally, Defendants contend that the school—specifically Mary Kidd—reached out to the Lopez family to get Nicholas caught up academically after he returned to school and that the family refused to cooperate. (Def.'s Statement of Undisputed Facts, ¶ ¶ 89, 91.) Defendants point to the testimony of Eileen Lopez, who wrote a letter on December 20, 2004, expressing her dissatisfaction with the District's efforts to help Nicholas catch up

academically. At her deposition, Mrs. Lopez was asked the following question and made the following response:

> Q: Okay, and did anything, did the School District do anything as a result of this December 20th letter?
>
> A: At this point I was disgusted. I didn't give them a chance. That's when I requested the work. I did it myself and yes, after that I got numerous phone calls from numerous people but I already had the work and my goal was the get my son caught up and that's what I did.

(Ex. H at 108.)

From this evidence, it is apparent that the school attempted to make arrangements to get Nicholas caught up academically when notified that Mrs. Lopez was not satisfied with the District's current efforts to help her son, but that Mrs. Lopez was unwilling to respond to the District's outreach attempts. Although the District made reasonable efforts to accommodate Nicholas academically, the Lopez family was uncooperative with these efforts. Rather than attempting to intentionally discriminate against Nicholas by denying him educational services, Defendants went out of their way to accommodate him during his absence and to get him caught up after he returned to school. Therefore, on this point summary judgment is granted as Plaintiffs have not raised a material issue of fact in support of their claim that Defendants were intentionally discriminatory to Nicholas based on his ethnic background.

### *Deliberate Indifference*

Plaintiffs also argue that Defendants were deliberately indifferent to the racial harassment Nicholas was suffering. After reviewing the evidence, the Court determines that Plaintiffs' proof does not show that Defendants' indifference was such that they intended the discrimination to occur. Plaintiffs contend that the school should have known

about this harassment that had been going on because "students did observe the racial harassment in the school." (Pl.'s Response to Def.s' Statement of Undisputed Facts ¶ 2.) However, the deposition testimony of Jordan Rapp, a fellow student at Webster-Thomas, relied on by Plaintiffs,[11] does not support their position. Specifically, Plaintiffs refer to these passages:

Q. Okay, and what did you see [RM] do?

A. I would say instigate and I've seen him call him a dirty Spic and likewise. He's a very provocative person, [RM]...

Q. Okay. Can you recall anything else, about the name calling or the harassment by [RM] that you haven't already talked about?

A. Let me think for a moment. Anything that I saw? I cannot recall. I just can only recall Nick and [RM], the state which they were on, I can only recall a very hectic state. I can't recall.

Q. I'm sorry, hectic state?

A. Well, a non-friendly state.

Q. Okay. So, you remember that [RM] and Nick were not getting along?

A. Yeah, to recall instances it's been too long to remember any other instances.

Q. Okay. So, the harassment was a long time ago, and you don't recall anything beyond the fact that [RM] used dirty Spic and some other, you know, nasty names and he did so in the hallway or in passing?

A. Right....

Q. Okay, and that you said was in the cafeteria or somewhere in the school?

A. Yeah, somewhere.

Q. Okay. What about the name calling by [RM]? Was that in the school?

A. I know they live by each other.

Q. Well, just the stuff that you saw.

---

[11]The excerpts of the deposition submitted do not indicated Rapp's age; however, his testimony implies he was a contemporary of Nicholas', thus the Court will presume he is now over eighteen years of age.

A. I never saw [RM] and Nick together outside of school. So, I'd say pretty much primarily in school.

(J. Rapp Dep. at 12:3–5, 25:2–22 & 29:8–18.) While this testimony is evidence that [RM] called Nicholas by racially-derogatory names, it does not show how Defendants were deliberately indifferent to the situation.

In order to be actionable, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999), requires that harassment be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." "Finding the harassment 'pervasive' means that the challenged incidents are 'more than episodic; they must be sufficiently continuous and concerted.'" *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d Cir. 2003) (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir.1989). Plaintiffs have offered no evidence that Nicholas' harassment was more than episodic, regardless of the adverse effect such harassment may have had on Nicholas' mental and emotional state.

It is true that, prior to Nicholas' suspension, Kidd was notified of the name-calling by Mr. Lopez via a phone call on September 28, 2004. (Kidd Dep. at 28.) Although Mr. Lopez told Kidd that the issue needed to be "handled right away," he did not request that a specific action be taken, conceding in his deposition that he cannot "tell [Kidd] how to do her job." (Ex. E at 26.) After the conversation, Kidd contacted the bus driver and asked him to monitor the situation between Nicholas and RM on the bus. (Kidd Dep. at 20, 26, 28.) Kidd met with Alyssa on September 30, 2004, (Kidd Dep. at 27.) At that meeting, Alyssa stated that she had not witnessed any incidents between RM and Nicholas, nor had she witnessed any harassment on the bus or at school. She did indicate, though, that she had

witnessed an incident between AM and Nicholas at the bus stop in front of her house, and testified that AM called Nicholas, "an F-ing Spic and just saying she was going to beat him up and stuff like that…." (Litto Dep. 8; *see also* Litto Dep 9, 11-12.) On October 1, 2004, Kidd also met with both Alyssa and Nicholas. (Kidd Dep. at 31-32.) At that time, Nicholas told Kidd that he was being harassed, and he also told her that he would report further instances of harassment directly to her, after she advised him that there would be consequences if he took matters into his own hands. (Kidd Dep. at 34; Nicholas Lopez Dep. at 25-26.) Kidd further testified that Nicholas had asked her not to speak with RM about the harassment. (Kidd D(*Id*. at ¶ .)ep. at 34-35.) Based upon the evidentiary proof, the Court finds that Kidd took appropriate steps to diffuse the situation between RM and Nicholas given the information that she had prior to the October 6 incident and given Nicholas' wishes that she not approach RM about the name-calling.

Moreover, following the punching incident on October 6, 2004, both Nicholas and RM were suspended. RM was suspended for three days (served as two days of out of school suspension and one four-hour Saturday detention) for the name-calling preceding the altercation. (Kidd Dep. at 111.) Nicholas was suspended for five days, and served two days of in-school suspension and a Saturday four-hour detention. (Kidd Dep. at 167-68.) Kidd's actions prior to and following the October 6 incident show no signs of indifference to the harassment that Nicholas was suffering, let alone an indifference so deliberate as to be motivated by a desire for the harassment to continue. Accordingly, summary judgment is appropriate here as there are no genuine issues of material fact concerning Kidd's actions regarding the hostile educational environment experienced by Nicholas.

***Supplemental Jurisdiction***

When the Federal claims in a complaint have been dismissed, and only State claims remain, the Court may decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1368 (1990). Such is the situation here. Therefore, the Court declines to exercise supplemental jurisdiction over the remaining State cause of action alleging negligence.

## CONCLUSION

For the above stated reasons Defendants' motion for summary judgment is granted with regard to Plaintiffs' Title VI claims and denied for Plaintiffs' negligence claims. Plaintiffs' cross-motion for summary judgment is denied in full. With regard to the remaining State law negligence claim, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over that claim. The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:   January 15, 2010
           Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J.  SIRAGUSA
United States District Judge